Elias Anaissie,                                    Case No. 1:15cv701

     Plaintiff,                                Judge Michael R. Barrett

        v.

University of Cincinnati Physicians, Inc.,

     Defendant.

## OPINION & ORDER

This matter is before the Court upon Defendant University of Cincinnati Physicians Inc.'s Motion for Summary Judgment.   (Doc. 55).   Plaintiff Dr. Elias Anaissie filed a Memorandum in Opposition (Doc. 75) and Defendant filed a Reply (Doc. 79).

## I.    BACKGROUND

Defendant University of Cincinnati Physicians, Inc. employs physicians to perform clinical work at the University of Cincinnati Medical Center ("UCMC").   (Doc. 55-2, Peter Clayton Decl., ¶ 2).   These physicians are also employed by the University of Cincinnati, where they provide education and research services for the College of Medicine. (Clayton Decl., ¶ 2).   In the spring of 2012, Defendant recruited Plaintiff to lead the new Bone Marrow Transplant Program that it was developing.   (Clayton Decl., ¶ 4).

While the parties dispute which doctors Plaintiff had a conflict with, there is no dispute that he had several conflicts his colleagues.   (Doc. 52, Elias Anaissie Dep. at 136-137; Clayton Decl., ¶ 5).   By February of 2013, Plaintiff suspected that his colleagues were trying to get rid of him.   (Anaissie Dep. at 139-140).   Initially, Plaintiff's direct supervisor was Dr. George Atweh, the Director of the Hematology Oncology

Division.  (Doc. 55-1, Gregory Rouan Decl., ¶ 2).  However, when Plaintiff complained about reporting to Dr. Atweh, Dr. Gregory Rouan, Department Chair for the Department of Internal Medicine, was made Plaintiff's direct supervisor.  (Rouan Decl., ¶ 5).  Dr. Rouan had multiple meetings with Plaintiff in an attempt to allay his concerns that his colleagues were trying to obstruct him or damage his reputation.  (Rouan Decl., ¶ 3).  Despite these issues, Defendant continued to employ Plaintiff because it had spent a significant amount of money to recruit Plaintiff and built the Bone Marrow Transplant program around him.  (Rouan Decl., ¶ 3).

In January of 2014, Dr. Rouan, Dr. Thomas Boat, the Dean of the College of Medicine, Dr. Myles Pensak, Defendant's CEO, and Lee Ann Liska, CEO for UCMC, sent Plaintiff a letter stating:

> UC Health and the [College of Medicine ("COM")] expects all of its leaders and faculty members to conduct themselves according to the RITE values – respect, integrity, teamwork and excellence, as well as to follow University of Cincinnati's faculty guidelines.  For your part, we ask that there be personal understanding of the culture and hierarchy of UC Health and the COM and to follow the RITE values.   In addition, we need you to focus on moving forward in a positive manner rather than dwelling on what has happened in the past.

(Anaissie Dep., Ex. 21).

On February 12, 2014, Plaintiff sent an email to Dr. Rekha Chaudhary, Director of the fellowship program.  (Anaissie Dep., Ex. 22).  Plaintiff stated that he was bringing to Dr. Chaudhary's attention the "continuous harassment for the past 12 mos and ongoing (2 days ago) by Dr. Dan Flora, senior Hem/Onc fellow at the time that unsubstantiated statements are presented as facts to senior leadership that I do not treat the fellows appropriately and that I should therefore not be allowed to work with them."   (Id.)  Plaintiff provided examples of "public attacks" made by Dr. Flora, and asked that Dr. Flora

not be assigned to work with him for the remainder of Dr. Flora's fellowship. When Plaintiff's email was shared with Dr. Flora, he disagreed with Plaintiff's account of what had happened, and also asked to not work with Plaintiff in the future. (Rouan Decl., Ex. 4).

On February 22, 2014, Plaintiff sent an email to Dr. Rouan and Liska requesting a meeting "to seek advice regarding a murder-for-hire offer against me brought to my attention by the Cincinnati P.D. (CPD) on Sunday 2/16, pm and Wednesday 2/19, pm, relayed to CPD by an informant who named the individual who approached him (a UCMC PharmD)." (Rouan Decl., Ex. 5). Plaintiff explained: "In response to the PD detective question if I ever had a problem with this PharmD, I stated that he had taken several negative actions against me but without a response from me because I was fully aware that he was very young and easily influenced by others." (Id.) Plaintiff stated that "[m]y wife and children are extremely concerned about my safety and bought me a pepper spray to carry on me. I will also ask UC police to walk with me at night from Hoxworth to the Eden parking, until my wife is assured by the CPD that this potential threat against my life has been addressed." (Id.)

On February 23, 2014, Plaintiff sent an email to Peter Clayton, Executive Director for Business Administration for the Department of Internal Medicine. (Clayton Decl., Ex. 1). In part of the email, Plaintiff repeated the murder-for-hire allegations, but with more detail:

> Separately, murder-for- hire contract on my life was brought to my attention by the Cincinnati Police department and UC police, courtesy a former PharmD, unstable and with substance abuse issues, and who was exposed to an intensive defamation campaign against me by his boss and by a few Hem/Onc folks including Dr. Flora, who befriended this pharmD. I am floored by this but in retrospect understand it well. Flora acted knowing

> well he had support in IM and not holding him accountable is yet another evidence of IM condoning his actions.
>
> ...and I am reminded in the letter drafted by Greg that I have to abide by the RITE values!
>
> My wife and adult children are frightened to the point that I avoid any discussion of the topic with them.

(Clayton Decl., Ex. 1). That same day, Plaintiff sent an email to Dr. Andrew Filak, the Senior Associate Dean for Academic Affairs, informing him of the murder-for-hire plot and explaining that "this individual was heavily influenced by an extensive and still ongoing campaign of incitemnt [sic] against me and defamation of my character, a campaign in which our fellowship program directors, Drs. Chaudhary and Smith were heavily involved to the point of dragging two fellows (Drs. Darnell and particularly Dr. Flora) into it." (Anaissie Dep., Ex. 23). Plaintiff explained that Dr. Flora had been very active for eighteen months in direct attempts at bullying him and "joining the campaign of defamation of my character led by Drs. Atweh, Latif, Smith, Chaudhary." (Id.)

On March 2, 2014, Plaintiff sent an email to Dr. Chaudhary and Dr. Frank Smith informing them of the murder-for-hire plot. (Anaissie Dep., Ex. 24) Plaintiff also explained: "As supported by evidence-based research, violent actions do not develop in a vacuum but typically result from personal reasons (finance, emotional, etc.) or from prolonged campaigns of incitement and defamation targeting groups (e.g. gays) or individuals, to the point of pushing unstable individuals experiencing severe stress to attempt violence." (Id.) Plaintiff then stated:

> As you know this PharmD witnessed and participated in an 18-mo long campaign of defamation and obstruction against me and which intensified preceding FACT inspection, incl. inciting this unstable individual to further defame my character with senior UCMC leaders according to those he told of the specific actions he was asked to take by senior Hem/Onc faculty.

> Two senior fellows were also involved esp Dr Flora who hope will be held accountable for his unprofessional behavior towards me in violation of ACGME and UC RITE guidelines and values.

(Id.)   After receiving this email, Dr. Chaudhary expressed concerns for her own safety to Dr. Rouan.   (Rouan Decl. ¶ 13).

On March 4, 2014, Dr. Rouan and Clayton met with Plaintiff and told him he was being placed on a leave of absence.   (Rouan Decl., ¶ 16).   Dr. Rouan and Clayton also handed Plaintiff a letter explaining that a third party attorney had been appointed to investigate the allegations Plaintiff raised in the March 2, 2014 email to Dr. Chaudhary. (Anaissie Dep., Ex. 9).   The letter stated: "You will therefore take at least two weeks off from work, or longer if necessary, for the purpose of undergoing investigation including fitness-for-duty examination.   This time off should also facilitate your cooperation with, and participation in, the investigation."   (Id.)   The letter also stated that Plaintiff's "complete cooperation with this investigation is expected."   (Id.)   Plaintiff explains that during the March 4, 2014 meeting, he told Dr. Rouan and Clayton that requiring him to undergo a fitness-for-duty examination was discriminatory.   (Anaissie Dep. at 247).

Steve Eberly was hired to investigate the issues raised by Plaintiff.   Plaintiff spoke to Eberly, but Plaintiff told Eberly that he needed his attorney to be present for their face-to-face meeting.   (Anaissie Dep. at 285).   Plaintiff contacted an attorney, but that attorney was out of town.   (Anaissie Dep. at 242).

On March 10, 2014, Dr. Rouan and Dr. Boat sent Plaintiff a letter by e-mail in which stated:

> It is our understanding that you have deferred to meet with the investigator until you first speak with counsel and you hope to do so today.   We trust you will be able to do so, so that you can give your prompt attention to this matter.   As stated in the March letter we believe your paid current leave

should facilitate your participation in the investigation and we expect your prompt participation.

(Anaissie Dep., Ex. 26).

On March 11, 2014, Dr. Rouan responded to an email sent by Plaintiff:

Finally, it is our understanding that the investigator, Mr. Eberly, asked to meet with you this past Friday. You declined because you wanted to first speak with counsel and indicated that you hoped to speak with your attorney on Monday. Apparently, you did not do so and have yet to commit to time and date to meet with Mr. Eberly. It has now been week since you were placed on paid leave and further delay is not acceptable. As we originally noted, your paid leave should be facilitating your participation in the investigation and your delay not only hampers this process but may also create further delay in your return to work. UCP is directing you to meet with Mr. Eberly on Wednesday March 12 or Thursday March 13, from 1:30 to 5:30. You are to contact Mr. Eberly today to confirm on which of those two days you will meet with him. Your failure to follow these instructions will be considered refusal, and will be treated accordingly.

(Anaissie Dep., Ex. 27).

On March 15, 2014, Plaintiff still had not met with Eberly or scheduled a time to meet with him. Clayton sent Plaintiff an email asking Plaintiff to "promptly contact Mr. Eberly to arrange a meeting with him." (Anaissie Dep., Ex. 28). Clayton also extended Plaintiff's period of leave beyond the original two weeks. (Id.)

On March 17, 2014, Clayton called Plaintiff and asked him why he had not yet met with Eberly. (Clayton Decl. ¶ 20). Plaintiff responded he was too busy buying a car and spending time with his family. (Clayton Dep. at 127). Clayton maintains that Plaintiff told him that he would not meet with Eberly, and that it would be difficult to complete the investigation without him. (Clayton Decl. ¶ 20). However, Plaintiff disputes that he ever refused to meet with Eberly. (Anaissie Dep. at 17). During the call, Plaintiff also told Clayton that Defendant was violating a number of statutes, including HIPAA, OSHA and the ADA. (Clayton Dep. at 107, 110). Plaintiff also told Clayton that he was meeting

with his attorney the next day. (Clayton Dep. at 129). However, it is not clear from the record whether Plaintiff was meeting with his attorney about the investigation or the claims he may have against Defendant. Clayton's notes from this phone call with Plaintiff indicate that Plaintiff stated that "carnage will be inflicted by him w/his attorney" and the "investigator is another violation of ADA." (Clayton Dep., Ex. 20). Clayton's notes also show that Plaintiff stated the he "will sign contract with lawyer tomorrow [and] will not change his mind." (Id.) Clayton understood that to mean that Plaintiff would be bringing litigation against Defendant. (Clayton Dep. at 125).

On March 18, 2014, Dr. Boat and Dr. Rouan sent a letter to Plaintiff terminating his employment. (Anaissie Dep., Ex. 29).

Plaintiff brings the following claims: termination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and Ohio law; denial of a reasonable accommodation in violation of the ADA; fitness for duty exam in violation of the ADA; and retaliation in violation of the ADA. This Court previously dismissed Plaintiff's claims alleging national origin and ancestry discrimination. (Doc. 14). Defendant moves for dismissal of Plaintiff's remaining claims.

## II.   ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of

production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## B. Americans with Disability Act

The Americans with Disabilities Act, as amended by the Amendments Act of 2008 ("ADAAA"), makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

Plaintiff asserts four basis of liability under the ADA: (1) wrongful termination; (2) failure to accommodate; (3) requiring a medical examination; and (4) retaliation.

Plaintiff has also brought claims for discrimination and retaliation under Ohio Revised Code § 4112.02 and § 4112.99. Because Ohio's disability discrimination law parallels the ADA, the same analytical framework applies to Plaintiff's claims under Ohio Revised Code § 4112.02. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (citing *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007); *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (1998)). Therefore, the analysis of Plaintiff's ADA claims also resolves his state law discrimination claims. *Id.* (citing *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444,

8

452 n. 4 (6th Cir. 2004)).

## C. Wrongful termination claim

Under the ADA, a plaintiff can prove a claim for discrimination based on wrongful termination through direct or indirect evidence. *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891 (6th Cir. 2016). Here, Plaintiff has not produced any direct evidence of discrimination, and instead relies on indirect evidence. When analyzing a discrimination claim based on indirect evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is used. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1179-182 (6th Cir. 1996)).

Under this approach, the initial burden is on the plaintiff to make out a prima facie case of discrimination by demonstrating that "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).

If the plaintiff establishes a prima facie case of discrimination under the ADA, then the burden shifts the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the defendant makes that proffer, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered

reason is merely a pretext for discrimination. *Id.*

## 1. **Disabled**

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2)(B). A person may also be considered disabled under the ADA if they are "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A).[1]

It is not clear whether Plaintiff is claiming that he was disabled during the time he was employed by Defendant or Defendant regarded him as being disabled. Plaintiff explains that he was diagnosed with mood disorder, was prescribed an anti-depressant and was referred by Defendant to a psychiatrist. Plaintiff references evidence that in May of 2013, he was diagnosed by his psychiatrist, Dr. Peirce Johnson, as having a mood

---

[1]As the Sixth Circuit has explained, the law governing the definition of "disabled" under the ADA has been recently altered:

> Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage ..., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject ... standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability ... should not demand extensive analysis." ADAAA § 2(b)(5).

*Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018).

disorder and attention deficit disorder. (Byrne Decl. ¶ 9). Plaintiff explains that in a meeting on November 18, 2013, Plaintiff told Dr. Boat, Clayton, and Dr. Rouan that he had depression. (Byrne Decl. ¶ 3). Plaintiff also references the testimony of Clayton who stated that he was aware that Plaintiff was seeing a psychiatrist. (Doc. 73, Clayton Dep. at 99).

As best as the Court can tell, Plaintiff is arguing that Defendant regarded him as disabled based upon the impairment Plaintiff reported to Defendant: depression.

A regarded-as-disabled claim exists where an individual (1) "establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity" and (2) the impairment is not "transitory and minor." *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018) (quoting 42 U.S.C. § 12102(3)).

Plaintiff explains that Defendant regarded him as disabled because Defendant believed he was substantially limited in the major life activities of interacting with others, concentrating, thinking and working. These activities are considered major life activities under the ADA regulations. *See* 29 C.F.R. § 1630.2(i). As evidence that Defendant regarded him as being limited in these major life activities, Plaintiff points to the Declaration of Clayton, which states that Plaintiff "had multiple conflicts with a variety of colleagues," and there were complaints about the way in which Plaintiff "interacted with others." (Doc. 55-2, Clayton Decl., ¶ 5). Plaintiff also points to the Declaration of Dr. Rouan, which states that they were concerned that Plaintiff "may not have the ability to provide the type of focus and cognitive thinking required in his job because of the toll the

alleged murder for hire plot was taking on him." (Doc. 55-1, Rouan Decl., ¶ 15).

The Sixth Circuit has recently reiterated that under the post-amendment ADA, an "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Pena v. City of Flushing*, 651 F. App'x 415, 420 (6th Cir. 2016) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th 1999)). Moreover, a fitness for duty examination "ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Id.* at 422 (quoting *Sullivan*, 197 F.3d at 813). Notably, Plaintiff has not questioned whether Defendant's decision to order him to undergo a fitness for duty exam was for a valid reason. In fact, Plaintiff avoids this line of cases, presumably because it is fatal to his claim. As the Sixth Circuit has explained: "[a] request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities." *Id.* at 420 (quoting *Sullivan*, 197 F.3d at 811).

However, even assuming that Plaintiff has set forth a prima facie case of discrimination, the Court concludes that Plaintiff has not carried his burden in showing that Defendant's proffered reason for his termination was pretext for discrimination.

### 2. **Pretext**

As the Sixth Circuit has recently re-iterated: "To survive a motion for summary judgment, [a plantiff] need not prove that [the defendant's] stated reason is pretextual; rather, [a plaintiff] must 'prove only enough to create a *genuine issue* as to whether the rationale is pretextual.'" *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL

327448, at *6 (6th Cir. Jan. 9, 2018) (quoting *Whitfield*, 639 F.3d at 260).   A plaintiff can meet this burden by showing one of three things: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."   *Id.* (quoting *Ferrari*, 826 F.3d at 895).

Defendant explains that it had a legitimate reason for terminating Plaintiff: insubordination after more than a year of being disruptive and causing multiple conflicts.

To begin, Plaintiff points out that he was terminated for insubordination, not the conflicts he had with his colleagues.   Based on the testimony of Clayton, this is correct. (Doc. 73, Clayton Dep. at 123).   Plaintiff then clarifies that he was allegedly terminated for two instances of insubordination: failure to undergo a fitness-for-duty evaluation and the failure to meet with Eberly.   Plaintiff argues that these claimed instances of insubordination have no basis in fact.

Plaintiff points out that he met twice with Dr. Bressler, who was selected by Defendant to conduct Plaintiff's fitness-for-duty examination.   Plaintiff admits that he missed the first appointment with Dr. Bressler, but states that Defendant does not have a policy in place which would indicate that missing an appointment is insubordination.

As explained above, a fitness for duty examination "ordered for valid reasons can neither count as an adverse job action nor prove discrimination."   *Pena v. City of Flushing*, 651 F. App'x. at 422 (quoting *Sullivan*, 197 F.3d at 813).   Employers may "requir[e] mental and physical exams as a precondition to returning to work."   *Id.*   Both before and after the 2008 Amendments to the ADA, the Sixth Circuit has "upheld a finding of insubordination for refusing to submit to such exams."   *Id.* (quoting *Sullivan*, 197 F.3d

at 812).

Setting aside the fitness-for-duty examination, Plaintiff acknowledges that he never met with Eberly. (Anaissie Dep. at 283). Instead, Plaintiff explains that he did have two telephone calls with Eberly. Plaintiff also emphasizes that he never told Eberly that he refused to meet with him, and Defendant knew that the only reason that he had not met with Eberly was because Plaintiff's attorney was not available. This is does not carry Plaintiff's burden of showing Defendant's reason for termination is pretextual.

On March 4, 2014, Dr. Rouan and Clayton met with Plaintiff and handed him a letter which stated that Plaintiff's "complete cooperation with this investigation is expected." (Anaissie Dep., Ex. 9). Plaintiff was given two weeks of paid leave to participate in the investigation. (Anaissie Dep., Ex. 9). By March 11, 2014, Plaintiff had not scheduled a meeting with Eberly, and Dr. Rouan informed Plaintiff:

> UCP is directing you to meet with Mr. Eberly on Wednesday March 12 or Thursday March 13, from 1:30 to 5:30. You are to contact Mr. Eberly today to confirm on which of those two days you will meet with him. Your failure to follow these instructions will be considered refusal, and will be treated accordingly.

(Anaissie Dep., Ex. 27). When Plaintiff failed to meet with Eberly on March 12 or March 13, Clayton extended Plaintiff's period of leave and asked Plaintiff to "promptly contact Mr. Eberly to arrange a meeting with him." (Anaissie Dep., Ex. 28). On March 17, 2014, Plaintiff still had not met with Eberly. When Clayton called Plaintiff to ask why, Plaintiff responded he was too busy buying a car and spending time with his family. (Clayton Dep. at 127). Clayton maintains that in this conversation Plaintiff told him that he would not meet with Eberly. However, Plaintiff disputes that he ever refused to meet with Eberly.

While Plaintiff attempts to cast doubt on Clayton's interpretation of their March 17th conversation, in his own deposition, Plaintiff confirmed that he did not plan to meet with Eberly himself, but planned to have his attorney be "in touch with" Eberly. (Anaissie Dep. at 313-14). While Plaintiff did make several references to meeting with an attorney in the conversation with Clayton, Clayton stated that he interpreted Plaintiff's statements as a threat Plaintiff was going to sue Defendant. (Clayton Dep. at 135). Plaintiff also told Clayton that Defendant created a "joke" of an extreme urgency to complete the investigation within a two-week period. (Clayton Dep. at 118). Moreover, it is undisputed that even after Defendant had extended Plaintiff's period of paid leave beyond the original two weeks, Plaintiff had yet to schedule a date for a meeting with Eberly, with or without his attorney. Based on this failure to meet within the time period dedicated for the investigation, despite Defendant's repeated demands to do so, Defendant was entitled to view Plaintiff's lack of cooperation in the investigation as insubordination. Plaintiff has not created a genuine issue of material fact regarding whether Defendant's reason for terminating Plaintiff was insufficient to motivate Defendant's decision to terminate him.

As additional evidence of pretext, Plaintiff points out that Defendant failed to follow its progressive discipline policy. Plaintiff explains that he only received verbal counseling for disruptive behavior prior to his termination. However, as Plaintiff himself has argued, Plaintiff was not terminated for disruptive behavior, but was terminated for insubordination.

Although Plaintiff has not made out a prima facie case of disability discrimination based on his termination, the Court holds that, even assuming that he had, Defendant

has offered a legitimate reason for terminating Plaintiff, and Plaintiff, in turn, has not created a genuine issue as to whether the rationale is pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's claim of wrongful termination under the ADA and Ohio law.

### D. <u>Failure to accommodate claim</u>

"Failure to provide a reasonable accommodation to a disabled, but otherwise qualified, person in the workplace is deemed unlawful discrimination under the ADA." *Williams v. AT & T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (citing 42 U.S.C. § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)).

In order to establish a prima facie case of disability discrimination under the ADA for failure to accommodate, a plaintiff must show that: "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, No. 17-5483, 2018 WL 988895, at *4 (6th Cir. Feb. 21, 2018) (quoting *Johnson v. Cleveland City Sch. Dist.*, 443 Fed.Appx. 974, 982-83 (6th Cir. 2011)). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.*

Plaintiff faces two hurtles in establishing a prima facie case of failure to accommodate. First, the Sixth Circuit has explained that if an employee is "regarded as" disabled, it would "obviate [the employer's] obligation to reasonably accommodate [the employee]." *Workman v. Frito–Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); *see also*

*Baker v. Windsor Republic Doors*, 414 Fed.Appx. 764, 776 (6th Cir. 2011) ("Despite the lack of analytical support for *Workman's* assertion that a finding of 'regarded-as' disability would obviate an employer's responsibility to offer reasonable accommodation to an employee, that holding remains the 'law of the circuit' and binds this panel."); 42 U.S.C. § 12201(h) (explaining that an employer "need not provide a reasonable accommodation . . . to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C)"; 29 C.F.R. § 1630.2(o)(4) (explaining that accommodations are required for disabled individuals with actual impairments or records thereof, but not for individuals "regarded as" disabled).

Second, even if Plaintiff's claim should have been construed as an actual-disability claim, the burden remains on the employee to request an accommodation. *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002). Plaintiff has failed to present evidence that he sought an accommodation. Where an employee fails to request a reasonable accommodation, employer's duty to engage in an interactive search for a reasonable accommodation is never triggered. *Id.* Therefore, Plaintiff has failed to establish a prima facie case of a failure to accommodate; and Defendant is entitled to summary judgment on Plaintiff's claim of failure to accommodate under the ADA and Ohio law.

### E.  Medical examination claim

The ADA prohibits employers from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

This provision applies to both disabled and nondisabled employees. *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011) ("A plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d).").

"An employer's request for a medical examination is job-related and consistent with business necessity when: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Denman v. Davey Tree Expert Co.*, 266 Fed.Appx. 377, 379 (6th Cir. 2007) (citations omitted). There is evidence in the record that Defendant had concerns about Plaintiff's safety, the safety of those around him, and whether he was able to care for his patients. (Clayton Decl. ¶ 13-15; Rouan Decl. ¶ 14-16). Plaintiff's only attempt to refute this evidence is testimony from one of Plaintiff's co-workers that Dr. Rouan told him that Plaintiff was going on leave because they were investigating Plaintiff's murder-for-hire claim. Plaintiff explains that this stated reason for the investigation has nothing to do with whether Plaintiff could perform the essential functions of his job. However, Defendant's investigation was not limited to whether Plaintiff could perform the essential functions of his job. Plaintiff had accused his co-workers of being involved in a murder-for-hire plot against him. The most that can be said about Dr. Rouan's statement is that it failed to explain that the purpose of the leave of absence was twofold. The statement does not show that Defendant's request for the fitness-for-duty exam was not job-related, or was inconsistent with business necessity. Therefore, Defendant is entitled to summary judgment on Plaintiff's claim under 42 U.S.C. § 12112(d)(4)(A).

## F. Retaliation claim

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."   42 U.S.C. § 12203(a).   "The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA."   *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

In the absence of direct evidence of retaliation, a claim of retaliation under the ADA is analyzed using the *McDonnell–Douglas* burden-shifting framework.   *Id.* (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).   The plaintiff bears the initial burden of establishing a prima facie case of retaliation, which requires a showing that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action."   *Id.* "Significantly, the causation prong requires [the plaintiff] to show but-for causation." *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *8 (6th Cir. Jan. 9, 2018) (quoting *Sharp v. Profitt*, 674 Fed.Appx. 440, 450 (6th Cir. 2016)).   If the plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action.   *Id.* (citing *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).   In the event this occurs, the burden shifts back to the plaintiff to show that the proffered reason for the action was "merely pretext."   *Id.*

This Court has recently re-iterated that "[a] retaliation claim cannot stand where an employee refuses a proper request for a medical exam or medical inquiry under 42 U.S.C. § 12112(d)(4)(A)." *Sloan v. Repacorp, Inc.*, No. 3:16-CV-161, 2018 WL 1070502, at *7 (S.D. Ohio Feb. 27, 2018) (collecting cases); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 814 (6th Cir. 1999) ("[I]t was incumbent upon appellant to challenge [the board's] actions through legal recourse, as appellant had done in the past, and not to engage in misconduct and insubordination to enforce his rights.") (alterations in original).

Plaintiff attempts to distinguish his claim by claiming that he was retaliated against because he claims he told Defendant that it was discriminating against him in violation of the ADA on March 4 and March 17. While Defendant disputes that Plaintiff accused Defendant of violating the ADA on March 4th, the timing makes no difference.

"Although temporal proximity can demonstrate a causal connection for the purposes of a prima facie case, it alone cannot establish pretext." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). The Court has already concluded that Plaintiff failed to create a genuine issue of material fact as to whether Defendant's stated reason for his termination – insubordination – was pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's claim of retaliation under the ADA and Ohio law.

**III.** **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendant University of Cincinnati Physicians Inc.'s Motion for Summary Judgment (Doc. 55) is **GRANTED**; and

2. There appearing to be no more matters for decision before this Court, this matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

_____*/s/ Michael R. Barrett*_____
Michael R. Barrett
United States District Judge